UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
FELIX GARCIA, PHILIP CALDAROLA,      :
ELEGGUA OSUN ELUFE, WAYNE            :
NORRIS, JAMES JAMESON, ELMER         :
ORTIZ, AMAURY BONILLA, ERCREY        :
GRANGIER, KEVIN WILLIAMS,            :
MALUMBA KAZIGO, BRANDON              :
HOLMES, ROLANDO CORONADO, PAUL       :
THOMPSON, and LAMONTE JOHNSON,       :      **OPINION AND ORDER**
          Plaintiffs,                :
                                     :      13 CV 8196 (VB)
v.                                   :
                                     :
BRIAN FISCHER; PHILIP D. HEATH;      :
MICHAEL A. CAPRA; WILLIAM F.         :
KEYSER, JR.; KEVIN WINSHIP; NOEL F.  :
MORRIS; and CANDICE P. SUMPTER,      :
          Defendants.                :
--------------------------------------------------------------x

Briccetti, J.:

      This case arises from an electrical fire in the early morning hours of April 18, 2011, at

Sing Sing Correctional Facility ("Sing Sing"), a New York State Department of Corrections and

Community Supervision ("DOCCS") maximum security prison in Ossining, New York.[1]  On

April 18, 2011, plaintiffs Felix Garcia, Philip Caldarola, Eleggua Osun Elufe, Wayne Norris,

James Jameson, Elmer Ortiz, Amaury Bonilla, Ercrey Grangier, Kevin Williams, Malumba

Kazigo, Brandon Holmes, Rolando Coronado, Paul Thompson, and Lamonte Johnson were

---

[1]     This case began as fourteen individual <u>pro se</u> actions, each with its own individual complaint filed in 2013 or 2014:  13 CV 8196; 14 CV 972; 14 CV 1319; 14 CV 1320; 14 CV 1447; 14 CV 1726; 14 CV 1766; 14 CV 1864; 14 CV 2068; 14 CV 2079; 14 CV 2500; 14 CV 3217; 14 CV 4963; and 14 CV 5738.  The Court accepted them all as related.  On May 28, 2014, the Court issued an Order granting limited-purpose <u>pro bono</u> counsel to represent all plaintiffs through pretrial proceedings (Doc. #13), and on July 10, 2018, extended the scope of their representation through summary judgment (Doc. #148).

incarcerated at Sing Sing.  As of October 2018, only Garcia, Kazigo, and Norris remained incarcerated there.

Plaintiffs bring Eighth Amendment claims pursuant to 42 U.S.C. § 1983 against Brian Fischer, then-commissioner of DOCCS; Philip Heath, Sing Sing's then-superintendent; Michael Capra, the current superintendent; William F. Keyser Jr., the deputy superintendent of security; Kevin Winship, the deputy superintendent of administration; Noel F. Morris, the fire safety officer; and Candice P. Sumpter-Myers,[2] a correction officer ("C.O.").  Plaintiffs seek (i) damages against Heath, Morris, and Sumpter-Myers because of their roles in plaintiffs' emergency evacuation during the fire; and (ii) injunctive relief against Fischer, Capra, Keyser Jr., and Winship to address the constitutionally inadequate fire safety regime at Sing Sing.

Now pending are two motions for summary judgment pursuant to Rule 56, filed on behalf of Fisher, Heath, Capra, Keyser Jr., Winship, and Morris (collectively, the "state defendants"), and C.O. Sumpter-Myers.  (Docs. ##152, 165).

For the reasons set forth below, the state defendants' motion is GRANTED IN PART and DENIED IN PART, and C.O. Sumpter-Myers's motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted briefs, declarations with exhibits, expert declarations, and statements of material fact pursuant to Local Civil Rule 56.1, which reflect the following factual background concerning the April 18, 2011, fire; the changes at Sing Sing in the aftermath of the fire; and the current fire safety regime.

---

[2]      Sued herein as "Candice P. Sumpter."

I.       Sing Sing Facilities and Staffing

Before addressing the events of April 18, 2011, a brief explanation about Sing Sing's facilities and staffing is necessary.

This case is brought by plaintiffs who, at the time of the fire, were housed in Housing Block A, the prison's largest housing block.  Housing Block A contains 686 single-occupancy cells arranged in two rows, or galleries, over four floors.  Each row is designated by a gallery letter:  the first floor contains the H and M galleries; the second floor contains the J and N galleries; the third floor contains the K and O galleries; and the fourth floor contains the L and P galleries.  The first floor also contains offices and other administrative space.  Housing Block A's facilities, which include a gymnasium, are connected by underground and aboveground corridors to Housing Block C, the special housing unit.  Housing Block C, which has a segregated recreation yard, houses inmates removed from the general population for disciplinary reasons or their own protection.

To oversee the inmates, Sing Sing staff is assigned to three work shifts, or tours:  Tour I is from 11:00 p.m. to 7:00 a.m.; Tour II is from 7:00 a.m. to 3:00 p.m.; and Tour III is from 3:00 p.m. to 11:00 p.m.  The staffing is greatly reduced during Tour I, the overnight shift.  For example, although about twenty-five officers are assigned to Housing Block A during Tours II and III, only four officers are assigned to Housing Block A during Tour I.  Therefore, as an additional layer of security during Tour I, the housing blocks (with the inmates and the officers inside) are locked in from the outside.  According to state defendants, locking housing blocks overnight is a standard security measure for maximum security facilities within the state.

II.     The Fire

During the overnight shift on April 18, 2011, Sing Sing was operating as usual with a skeletal staff of about thirty-seven officers, four of whom were on duty in Housing Block A, including C.O. Sumpter-Myers and C.O. Welch.  The two most senior officers on duty—Lt. Anthony Theriault and Sgt. Richard Moss—were stationed in the watch commander's office. Sgt. Orrico, the field sergeant, was doing rounds of the facility.

Neither Supt. Heath, who was responsible for organizing and implementing the fire prevention and firefighting program at Sing Sing, nor Morris, Sing Sing's designated fire safety officer, was on duty.  However, if a fire occurred, Sing Sing procedures tasked the watch commander with notifying Supt. Heath and Morris if they were not present.  Upon his arrival, Morris would direct the firefighting efforts.

2:00 a.m. or shortly thereafter.  An electrical fire broke out in the basement of Housing Block C and knocked out the power to five buildings, including Housing Block A.  The Ossining Fire Department, which responded to the fire, reported the fire started in the electrical room's ceiling junction box and spread to combustible items on the floor.  A later investigation determined the fire occurred where the main power system is connected to the emergency power generator, disabling not just the main system but the back-up system as well.

Smoke spread throughout Housing Block A, although the parties disagree when exactly this occurred.  Plaintiffs claim smoke filled the housing block close to 2:00 a.m., shortly after the fire began and electric power was lost.  The state defendants claim that regular radio contact with the officers on duty in Housing Blocks A and C demonstrate no one reported seeing or smelling smoke until 2:55 a.m. when a correction officer stationed in Housing Block C reported via radio

that he smelled smoke. However, a correction officer's logbook entry for Housing Block C notes that there was a "smoke smell" at 2:25 a.m. (Doc. #185-53).

According to plaintiffs and correction officers in Housing Block A at the time, the smoke was thick and made it difficult to breathe. Visibility was limited to no more than a few inches. As plaintiff Thompson testified in his deposition: "[I]n prison, you could stick your hand out your cell with a mirror, and you can look at the gallery to see what's going on.· Because it was so black, you couldn't see anything that was going on. . . . [I]t was so much smoke that I couldn't see." (Doc. #185-16 ("Thompson Dep.") at 24, 36). The state defendants, however, claim plaintiffs and the correction officers overstate the severity of the smoke. In support, they point to the sheer size of the facility, the fact that firefighters did not wear breathing apparatuses when they entered the housing block nearly an hour later, and the lack of fatal or life-threatening injuries.

The parties agree the housing block was in near-total darkness. The main and back-up power systems had failed, the emergency battery-powered lights were not functioning, and some correction officers' personal flashlights were not working.

Locked in their cells, plaintiffs testified they were unaware of the origin and severity of the fire. Although Sing Sing officials received notice of the fire from Sing Sing's smoke detectors, no smoke detector or fire alarm sounded to alert plaintiffs. Because the power outage rendered the public address system inoperable, no announcements were made.

Officers and plaintiffs alike testified in their depositions that they feared for their lives. Several correction officers testified they heard the inmates screaming for help: "Help us, don't leave us here . . . . Do not let us die." (See, e.g., Doc. #185-22 ("Sumpter-Myers Dep.") at 84).

2:55 a.m.  A correction officer notified Sgt. Orrico and Lt. Theriault of the smoke in Housing Block C, prompting Orrico and Theriault to go to Housing Block C, where they saw smoke escaping from a floor vent near the door.  When they opened the door to Housing Block C's basement, the officers found "a considerable amount of smoke," indicating there was a fire they could not extinguish on their own.  (Doc. #158 ("Orrico Decl.") ¶ 21).  The officers informed Sgt. Moss in the watch commander's office.

3:00 a.m.  Sgt. Moss called the Ossining Fire Department.  Sgt. Orrico began evacuating the inmates from Housing Block C.

3:30 a.m.  Ossining firefighters arrived at Sing Sing and an officer took them to the fire in Housing Block C's basement. Once the fire was under control, Sgt. Moss accompanied the firefighters to Housing Block A.

3:40 a.m.  Ossining firefighters advised Sgt. Moss to evacuate the officers and inmates from Housing Block A.

3:50 a.m.  Sgt. Moss directed the Housing Block A evacuation with the four correction officers on duty.  According to the state defendants, the block's cell doors can usually be opened simultaneously and remotely using the main power system or the back-up power system. However, because of the power outage affecting both the main system and the back-up system, the cells could only be opened manually with a "t-key."  Only four t-keys are kept in Housing Block A.  State defendants state at least two officers are needed to manually open a cell:  one officer inserts a t-key into a hole above each cell door to open it while the other officer watches to make sure the inmate does not attack the officer with the t-key.

Sgt. Moss soon requested additional officers for assistance in the evacuation.  Because the power was out, the officers went cell by cell through Housing Block A and unlocked each

cell individually using one of the four t-keys. Sgt. Moss directed that the inmates be evacuated to the Housing Block A gym until that location reached capacity, and then to an outdoor recreation yard. The parties dispute how long it took to release each inmate from his cell.

Some plaintiffs testified they were among those evacuated to the gym. According to those plaintiffs, for several hours, the gym also had no power and was filled with smoke. They claim there was no supervision and plaintiffs were surrounded by violent maximum-security inmates for several hours. Other plaintiffs were evacuated to the outdoor recreation yard, which they testified was dark and unsupervised.

4:00 a.m. Supt. Heath and Morris, the fire safety officer, were alerted about the fire and evacuation.

4:15 a.m. Supt. Heath, who was staying in nearby DOCCS-provided housing in Ossining, arrived at Sing Sing. He assisted in the evacuation efforts by directing inmates to the holding areas, checking on the officers and inmates in the Housing Block A gym and the outdoor keeplock yard, and monitoring the use of electrical generators to clear out the smoke.

4:53 a.m. Morris, who lived about thirty miles from Sing Sing, arrived at the facility. Morris testified in his deposition he retrieved the facility's fire truck and came upon the chief of the Ossining Fire Department who informed Morris that the firefighters had extinguished the fire. Morris then went directly to the site of the fire. Morris also testified he did not know whether the evacuation plan was followed.

5:30 to 6:00 a.m. Officers completed the evacuation of the Housing Block A inmates. Officers brought back-up generators and large fans to Housing Block A to remove residual smoke.

7:00 a.m.  Officers began returning inmates to their cells and sending others to the infirmary.  No one reported any fatal or life-threatening injuries as a result of the fire.

III.    Improvements After the Fire

Sing Sing officials state that since the fire, they have made several improvements to the prison's facilities.  However, plaintiffs generally testified in their depositions they did not recall any of the following changes being made after the fire.

First, officials say the electrical routing system in the Housing Block C basement was repaired and replaced with a new system of wiring "intended to ensure against an interruption of the power supply between the back-up generator and Housing Block A's power grid."  (Doc. #159 ("Delanoy Decl.") ¶ 25).  The state defendants provide no additional information about this repair, such as how it was accomplished or how much it cost or whether there were any differences between the new and old wiring systems.

Second, Sing Sing officials determined that the Housing Block B yard would be the future primary evacuation point for all inmates, because it is large, outdoors, and surrounded by guard towers.  To facilitate an emergency evacuation, a secure route was installed between Housing Block A and the Housing Block B yard.  The installation cost about $15,000.

Third, within six months of the fire, Sing Sing officials repaired the manual emergency release mechanisms of some cells in Housing Block A.  During the fire, state defendants stated some cells were difficult to open due to problems with the manual release mechanisms.  The repairs cost about $155,000.

Fourth, in 2013, new battery-powered emergency lights were installed in Sing Sing's housing blocks, gymnasium, visiting area, mess hall, and connecting areas.  During the fire, by

the time officials evacuated the inmates, the previous battery-powered lights had died. The new battery-powered lights are designed to last at least ninety minutes without power.

Fifth, in 2014, Sing Sing officials approved a $3.9 million contract to upgrade the Housing Block A window system to make the windows easier to open in the event of an emergency. Before the fire, the windows opened individually with the use of a ladder and a crank. Under the new system, the windows purportedly open more easily, although the state defendants do not specify how.

IV.    Sing Sing's Current Fire Safety Regime

Sing Sing's fire safety regime is governed by DOCCS Directive 4060, titled Facility Fire Prevention, which sets out the minimum safety requirements each facility must have in place regarding fire safety and prevention.[3] Sing Sing divides its fire safety regime into several different components: (i) compliance with Directive 4060, (ii) the prison's physical structure, (iii) written safety materials, (iv) fire safety training, (v) internal and external evaluations and accreditations, and (vi) fire drills.

A.    Directive 4060

Under Directive 4060, Sing Sing's fire safety officer must prepare "an uncomplicated, yet complete, [fire safety plan] for evacuation of inmates and personnel from each area in case of fire or other emergency and incorporate it into the training program." (Stephens Decl. Ex. 30 at ECF 4). It must include the following components: (i) the procedure for reporting a fire or other emergency; (ii) the life safety strategy and procedures for notifying, relocating, or evacuating

---

[3]    Directive 4060, dated March 10, 2010, was the operative directive and policy in place on April 18, 2011. (Doc. #185-58). It was superseded by Directive 4060, dated February 5, 2016. (Doc. #185-30). Because the 2010 and 2016 versions of Directive 4060 are identical in substance and requirements, the Court will refer to the 2016 directive, which currently governs the fire safety regime.

occupants; (iii) site plans showing assembly points, fire hydrants, and routes for fire department vehicle access; (iv) floor plans identifying the locations of exits, primary and secondary evacuation routes, accessible egress routes, areas of refuge, fire alarms, portable fire extinguishers, fire hose stations, and fire alarm annunciators and controls; (v) a list of major fire hazards; (vi) the name of the certified outside vendor for maintenance and inspection of fire suppression systems, sprinkler systems, and fire pumps; and (vii) a list identifying and assigning personnel responsible for maintenance, housekeeping, and controlling fuel hazard sources.

A copy of the plan must be maintained in the facility's red book, which is stored in the watch commander's office and provides a quick summary of Sing Sing's procedure for fires or other emergencies. (Doc. #185-31 (the "red book plan")). According to Morris, however, Sing Sing only stores an abbreviated three-page version of the fire safety plan in the red book.

The red book plan, which has not materially changed since 2011, includes instructions for staff who discover the fire and monitor the fire alarm system, the watch commander, and the security supervisor responsible for the affected area. The plan notes that in the event of a fire, the watch commander "shall notify the superintendent (via operator) and facility fire safety officer (if not on duty)." (Red book plan at 1). Upon arrival, the fire safety officer will take responsibility for the firefighting efforts. The plan also lists ten procedures to fight fires and cites to addenda listing the fire response team members, location of fire-related equipment, and staging areas.

B.    <u>Physical Features</u>

Sing Sing maintains several physical features that are intended to ensure fire safety. The facility has a fire alarm system and multiple fire exits. Fire hydrants are installed throughout the facility. Emergency lights, portable fire extinguishers, standpipes, and fire hoses, which can

extend to any cell, are installed in each housing block. The kitchen and the mess hall have automatic suppression systems—systems that use water or gas to extinguish fires without human intervention. Housing Block A and its cell locking system are connected to an emergency generator. Guards are also equipped with flashlights and radios.

     C.    <u>Written Fire Safety Materials</u>

In addition to the three-page fire safety plan in the red book, Sing Sing posts signs in English and Spanish depicting primary and secondary emergency evacuation routes throughout the prison. These signs also show in English the locations of fire alarms, hose stations, alarm control panels, and fire extinguishers. Sing Sing also maintains site plans showing the locations of the fire hydrants and the entry points for local fire departments. These physical plans are not posted but are maintained in the executive offices.

     D.    <u>Sing Sing's Training and Fire Response Team</u>

All correction officers receive training on fire emergencies when they are at the Correctional Services Training Academy. Sing Sing also maintains a fire response team—correction officers specifically designated and trained to respond to fires and other emergencies. At least some members of the fire response team are on duty during all three tours at Sing Sing, although the overnight tour, unlike the other tours, includes no deputy fire safety officer.

In 2018, about sixty-two correction officers comprised the fire response team—the team was about the same size in 2011. Of those, about thirteen officers were classified as advanced firefighters and the remaining officers were trained in only basic firefighting procedures. Incipient stage firefighters receive at least sixteen hours of initial training and eight hours of annual training thereafter. Advanced firefighters receive additional advanced training, including

live burn exercises in firefighting gear.  Morris, as the fire safety officer, participates in periodic DOCCS-wide training.

Sing Sing also works with members of the Ossining Fire Department to facilitate aid in the event of an emergency.  Fire department personnel annually review the fire and safety plan.

E.      Internal Evaluations and External Accreditations

Sing Sing conducts periodic checks of fire safety equipment, such as flushing fire hydrants and inspecting fire extinguishers, purportedly three times a day.  However, the state defendants' records show those inspections were not always marked completed for each shift.  Similarly, a higher-ranking officer also is tasked with performing a weekly check of the same equipment, and records show those inspections were not completed every week.

DOCCS Central Office's fire safety coordinator or a designee annually evaluates Sing Sing's fire and safety regime.  The American Correctional Association ("ACA") also evaluates Sing Sing for accreditation, which includes a review of fire safety procedures, every three years. Sing Sing has been accredited by the ACA for at least the most recent three triannual periods, 2010–13, 2013–16, and 2016–19.

F.      Fire Drills

Under Directive 4060, Sing Sing is tasked with conducting quarterly fire drills in its housing blocks.  For Housing Block A, during Tours II and III, officials conduct evacuation drills one gallery at a time, because, as Morris explained, "releasing several hundred inmates at once would understandably cause security concerns."  (Doc. #156 ("Morris Decl.") ¶ 32). During Tour I, Directive 4060 permits officials to conduct simulated drills, or tests when staff go through the evacuation procedure without actually releasing the inmates.

While Morris maintains drills are conducted quarterly on each shift in compliance with this directive for all housing blocks, including Housing Block A, defendants submit only "examples" of a "partially completed" list of fire drills and select fire drill checklist forms for galleries L and P. (Morris Decl. ¶¶ 33–34).

Plaintiffs, however, dispute such drills were conducted quarterly on each shift. In support, they created a summary of fire drill evacuations reports from 2010 to 2016 from 2,567 records the state defendants produced. (Doc. #185-1 ("Fire Drill Evacuation Report Summary") at 1). According to plaintiffs, in sum, from 2010 to 2016, Sing Sing officials should have conducted 616 drills but only conducted 583 drills. In addition, several plaintiffs testified during their depositions that they never participated in any fire drills at Sing Sing.

## DISCUSSION

I. <u>Legal Standards</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir.

2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004). In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.    Exhaustion

Defendants argue three plaintiffs—Elufe, Garcia, and Kazigo—did not properly exhaust their administrative remedies and their claims should be dismissed.

The Court agrees.

Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under . . . Federal law[] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  Requiring a prisoner to exhaust his administrative remedies allows prison officials a "fair opportunity to correct their own errors."  Woodford v. Ngo, 548 U.S. 81, 94 (2006).  An inmate's claim is properly dismissed with prejudice when "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust."  Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004).

For a New York state prisoner to exhaust his claim, he must comply with the three steps of New York's Inmate Grievance Program ("IGP") by (i) submitting a complaint to the clerk of the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged incident, (ii) appealing the decision to the superintendent within seven days of the committee's response, and (iii) appealing to the Central Office Review Committee ("CORC") within seven days of the superintendent's response.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.

The IGP supervisor or IGRC may consolidate like grievances and assign those grievances a single grievance calendar number.  (Doc. #185-67 ("DOCCS Directive 4040") at 6).  The

consolidated grievance materials must include a list of every inmate whose grievance has been consolidated.  (Id.).  One or several spokespersons shall be selected to be grievants of record. DOCCS Directive 4040 provides that "[a]n effort will be made to notify all such grievants of the response at each level, either by written response, posting on the inmate bulletin boards or radio announcement, however, the grievant of record will receive a written response from each level." (Id.).

To withstand summary judgment, a plaintiff must offer more than conclusory allegations that he or she has exhausted administrative remedies.  See, e.g., Bennett v. James, 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) (granting summary judgment on exhaustion grounds when plaintiff provided only "conclusory allegations"); Dorsey v. Artus, 2013 WL 5463720, at *8 (N.D.N.Y. Sept. 30, 2013).

DOCCS records indicate plaintiffs Garcia, Elufe, and Kazigo failed to exhaust administrative remedies and these plaintiffs raise no genuine dispute otherwise.  Although Garcia timely filed a grievance to the IGP concerning the fire, DOCCS records indicate he did not appeal to CORC.  Garcia submits a declaration in which he states his grievance was denied and he did appeal to the IGRC and the superintendent, but he does not provide copies of those grievances, copies of the alleged denials from IGRC or the superintendent, specify the grievance numbers assigned to them, or state the dates in which he sent them in.  Nor does Garcia offer an explanation why, if he did file the necessary appeals, prison officials have no record of those grievances but do have records of others he filed around the same time.  Moreau v. Peterson, 672 F. App'x 119, 120 (2d Cir. 2017) (summary order) (finding inconsistent plaintiff's claim he was unable to file some grievances but not others).  DOCCS records also indicate neither Elufe nor Kazigo filed any grievance in April or May 2011, much less any a grievance related to the fire.

Elufe and Kazigo have provided only conclusory allegations that they exhausted administrative remedies. Moreover, there is no evidence these plaintiffs' grievances were somehow consolidated with others concerning the fire.

Accordingly, the Court finds defendants have shown plaintiffs Garcia, Elufe, and Kazigo failed to exhaust administrative remedies. Because the time in which these plaintiffs could have exhausted administrative remedies has long since passed, all claims brought by Garcia, Elufe, and Kazigo are dismissed with prejudice.

III.    Damages Claim

Plaintiffs' only remaining damages claim proceeds against Supt. Heath, Morris, and C.O. Sumpter-Myers on the theory that these defendants were deliberately indifferent to the risk of exposing plaintiffs to heavy smoke for several hours during the emergency evacuation on April 18, 2011.[4]

The state defendants argue they are entitled to summary judgment on these conditions of confinement claims, because, as a matter of law, (i) plaintiffs have not satisfied either the objective or the mens rea components of their Eighth Amendment claim, (ii) the state defendants are entitled to qualified immunity, and (iii) Supt. Heath and Morris were not personally involved in the alleged constitutional violation.

---

[4]    Plaintiffs argue defendants failed "to plan, train, or prepare for the fire despite an explicit obligation to do so." (Doc. #170 ("Pls. Opp.") at 7). However, the Court previously dismissed plaintiffs' claims based on allegedly constitutionally inadequate fire safety conditions that existed before the 2011 fire because plaintiffs did not allege facts to suggest any defendant knew about and ignored the risks created by any deficiencies in Sing Sing's fire safety plan. (Doc. #75 ("January 22, 2016, Opinion & Order") at 11, 12, 14). The Court also later denied plaintiffs' attempt to replead a claim concerning inadequate fire safety conditions that existed before the fire in the proposed third consolidated amended complaint. (Doc. #145 at 4–5). Accordingly, plaintiffs' damages claim concerning the emergency evacuation is not based on defendants' alleged failure to plan, prepare, or train for the evacuation before the fire occurred.

The Court disagrees. Plaintiffs' damages claim cannot be resolved on summary judgment because genuine issues of material fact exist as to whether plaintiffs' emergency evacuation was sufficiently serious, and whether Supt. Heath and Morris had a sufficiently culpable state of mind, are entitled to qualified immunity, and were personally involved in the allegedly unconstitutional evacuation.

A.      Objective and Mens Rea Elements

Genuine issues of material fact on both the objective and mens rea elements of an Eighth Amendment violation preclude an award of summary judgment in the state defendants' favor.

To establish a violation of Eighth Amendment rights, an inmate must satisfy an objective prong and a mens rea prong. Namely, an inmate must show (i) "a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,'" and (ii) "a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001).

1.      Objective Component

To satisfy the objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal citation omitted). Forcing an inmate to face such a risk violates the Eighth Amendment's requirement "that inmates be furnished with basic human needs, one of which is 'reasonable safety.'" Helling v. McKinney, 509 U.S. 25, 33 (1993) (future harm resulting from exposure to second-hand cigarette smoke can give rise to an Eighth Amendment claim). The Court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone

unwillingly to such a risk." Id. at 36. The prisoner must demonstrate "the risk of which he complains is not one that today's society chooses to tolerate." Id.

Plaintiffs have raised a genuine question as to whether the conditions of the emergency evacuation were sufficiently serious to constitute an Eighth Amendment violation. Plaintiffs and correction officers in Housing Block A testified they were forced to breathe thick, black smoke for hours in the housing block. Indeed, they testified it was difficult to see or breathe, and the state defendants concede the housing block lost power and the windows would not open. Plaintiffs claim these conditions occurred as early as 2:00 a.m. and lasted until 5:30 or 6:00 a.m. when the evacuation was complete. Assuming the truth of that timeline, plaintiffs were exposed to noxious smoke for between three and four hours.

The state defendants dispute the severity and length of the smoke exposure. They claim the smoke did not interfere noticeably with the ability to see or breathe—a fact, they argue, that is proven by the sheer size of the facility, that firefighters did not wear breathing apparatuses, and the lack of fatal or life-threatening injuries. They also argue plaintiffs were exposed to smoke for a much shorter period of time than plaintiffs maintain because smoke was not reported until close to 3:00 a.m.

Such disagreement plainly reveals the existence of a genuine issue of material fact—namely, whether the conditions of plaintiffs' evacuation posed a substantial risk of serious harm.

2.    Mens Rea Component

The mens rea component is satisfied by showing "the defendant 'acted with more than mere negligence' by, for instance, 'knowing of, and disregarding, an excessive risk to inmate health or safety.'" Garraway v. Griffin, 707 F. App'x 16, 19 (2d Cir. 2017) (summary order) (alterations omitted) (quoting Walker v. Schult, 717 F.3d at 125). "Evidence that a risk was

obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker v. Schult, 717 F.3d at 125 (internal quotation omitted).

Plaintiffs have offered sufficient evidence to permit a reasonable juror to conclude Supt. Heath and Morris was aware of the harm plaintiffs faced during the emergency evacuation and disregarded the risk to plaintiffs' health and safety.[5]  It is undisputed that both Supt. Heath and Morris knew about the fire and subsequent evacuation when they were contacted in the early hours of April 18, 2011.  Supt. Heath concedes he participated in but did not direct the evacuation efforts.  Morris testified he did not consult with anyone regarding the inmate evacuation and instead went to the site of the fire.  Indeed, Morris testified in his deposition that he did not know whether the evacuation plan was properly implemented.  Because Supt. Heath and Morris were both charged with overseeing and directing emergency evacuation due to fire, their actions during the evacuation could give rise to the inference that they knew plaintiffs were being exposed to dangerously heavy smoke, yet deliberately failed to ensure inmates were quickly and safely evacuated.

B.    Qualified Immunity

The state defendants' argument that they are entitled to qualified immunity also fails.

---

[5]    The Court finds the deliberate indifference standard, not the malicious and sadistic intent standard, applies to plaintiffs' Eighth Amendment claims.  It is well-settled that conditions of confinement claims call for a deliberate indifference standard, Farmer v. Brennan, 511 U.S. at 834, and fire safety conditions are usually analyzed as conditions of confinement claims, see, e.g., Candelaria v. Coughlin, 1996 WL 88555, at *10 (S.D.N.Y. Mar. 1, 1996); see also Collins v. Homestead Corr. Inst., 452 F. App'x 848, 850 (11th Cir. 2011) (applying deliberate indifference standard to emergency evacuation claim).  The state defendants' argument for heightened malicious and sadistic intent standard relies on cases concerning prison riots and excessive force, which are not applicable here.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). A qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998). "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003); see also Atkins v. Cty. of Orange, 372 F. Supp. 2d 377, 403–04 (S.D.N.Y. 2005) (precluding summary judgment on defense of qualified immunity as to plaintiff's excessive force claim), aff'd sub nom. Bellotto v. Cty. of Orange, 248 F. App'x 232 (2d Cir. 2007) (amended summary order).

Here, there is a genuine issue of material fact regarding whether defendants acted with deliberate indifference. Therefore, this Court cannot determine at this time whether it was objectively reasonable for defendants to believe that their acts were lawful.

Accordingly, the state defendants' motion for summary judgment on the basis of qualified immunity is denied.

C.     Personal Involvement

Finally, Supt. Heath and Morris are not entitled to summary judgment for lack of personal involvement because a reasonable jury could find Supt. Heath and Morris directly participated in the alleged constitutional violation.

To prevail on a Section 1983 claim, a plaintiff must demonstrate a defendant's personal involvement in the claimed violation of his Eighth Amendment rights. <u>Grullon v. City of New Haven</u>, 720 F.3d 133, 138 (2d Cir. 2013). A plaintiff can demonstrate the personal involvement of a supervisory defendant with evidence that "the defendant participated directly in the alleged constitutional violation." <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).[6] Direct participation can include "ordering or helping others to do the unlawful acts, rather than doing them [oneself]." <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 155 (2d Cir. 2001). However, supervisory officials may not be held liable merely because they were in a position of authority. <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994).

        1.    <u>Supt. Heath</u>

The undisputed facts show that Supt. Heath participated in the evacuation. He arrived at Sing Sing at 4:15 a.m., about twenty-five minutes after the inmates' evacuation began at 3:50 a.m. and more than an hour before it ended between 5:30 a.m. and 6:00 a.m. He then assisted other officers in the evacuation by directing inmates to the holding areas, checked on the health and safety of already evacuated inmates, and monitored the process of hooking up the electrical generators to clear out the smoke condition. Plaintiffs have offered evidence that because of Supt. Heath's role as the facility's superintendent in fires and other emergencies, he had the authority to change or alter the course of the evacuation. Indeed, in the event of a fire, under the red book plan, the watch commander is directed to first notify the superintendent.

---

[6]    Although the Second Circuit has found other actions taken by supervisory defendants may also constitute personal involvement, the Court need not address these other theories of liability because the Court previously found they were not alleged in the plaintiffs' SCAC and they are incompatible with plaintiffs' emergency evacuation claim. (<u>See</u> January 22, 2016, Opinion & Order at 14).

The state defendants argue that because Supt. Heath did not initially order the evacuation, Supt. Heath's participation is not sufficient to subject him to liability. That argument relies on an unduly narrow construction of plaintiffs' evacuation claim, which concerns more than just the initial decision whether and when to evacuate but also whether the totality of evacuation complied with the standards of the Eighth Amendment. A reasonable jury could find Supt. Heath was personally involved in the underlying Eighth Amendment violation.

### 2. Morris

Although the question of Morris's involvement in the alleged constitutional violation is closer, plaintiffs have raised a genuine issue of material fact as to Morris's involvement. As directed under the fire safety plan, officers notified Morris about the fire and evacuation. Morris arrived at Sing Sing shortly before 5:00 a.m. while officers were still evacuating the inmates. Morris retrieved the fire truck, and even after learning the fire had been extinguished, went directly the site of the fire. A reasonable jury could find those actions constitute direct involvement in the alleged constitutional violation.

Accordingly, because a reasonable jury could find that Supt. Heath and Morris were personally involved in the allegedly unconstitutional evacuation, the state defendants' motion for summary judgment for lack of personal involvement is denied.

### IV. Eighth Amendment Injunctive Relief Claim

The state defendants argue they are entitled summary judgment as to the claim for injunctive relief to correct the ongoing Eighth Amendment violations which allegedly plague Sing Sing's fire safety regime.[7]

---

[7]    It is well-settled in this Circuit that inmates no longer incarcerated at a prison facility cannot seek injunctive relief as to that facility. See Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996). As of the filing of the instant motions, only Garcia, Kazigo, and Norris remained

For the following reasons, the Court agrees.

A.    Legal Standard

Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a).

To pursue a claim for injunctive relief from unconstitutional conditions of confinement, a plaintiff must show an "objective assessment of prison conditions compels the conclusion that inmates are being subjected to unreasonable safety risks."  Coniglio v. Thomas, 657 F. Supp. 409, 414 (S.D.N.Y. 1987).  "[F]ire safety conditions that are 'adequate,' and do not subject detainees to a constant, imminent risk of death or injury" do not violate the Eighth Amendment. Id. at 413.  Therefore, "not every deviation from ideally safe conditions constitutions a violation of the Constitution."  Id. at 414 (quoting Santana v. Collazo, 714 F.2d 1172, 1183 (1st Cir. 1983)).  As a general matter, "the federal courts must avoid becoming enmeshed in the minutiae of prison operations, and should decline to second-guess prison administrators in the operation of correctional facilities."  Id. (citing Bell v. Wolfish, 441 U.S. 520, 562 (1979)).

To objectively assess whether a prison's fire safety regime subjects inmates to unreasonable safety risks, courts have considered the following factors:  the facility's physical structure and potential fire hazards, see Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir. 1982); inmate overcrowding, see Fischer v. Winter, 564 F. Supp. 281, 289 (N.D. Cal. 1983); available

---

incarcerated at Sing Sing.  Furthermore, as discussed above, Garcia and Kazigo failed to exhaust administrative remedies, and their claims are dismissed with prejudice.  Accordingly, claims for injunctive relief by plaintiffs Garcia, Kazigo, Caldarola, Elufe, Jameson, Ortiz, Bonilla, Grangier, Williams, Holmes, Coronado, Thompson, and Johnson are moot.  However, because Norris still remains incarcerated at Sing Sing and may pursue injunctive relief, the Court addresses plaintiff Norris's claim.

fire safety mechanisms such as alarms and sprinklers, see Coniglio v. Thomas, 657 F. Supp. at

414; the evacuation plan, see Toussaint v. McCarthy, 597 F. Supp. 1388, 1410 (N.D. Cal. 1984);

officers' training in the event of a fire, see Mabery v. Keane, 1998 WL 148386, at *6 (S.D.N.Y.

Mar. 30, 1998); and the occurrence of regular fire drills, see Women Prisoners of D.C. Dep't of

Corr. v. District of Columbia, 877 F. Supp. 634, 669 (D.D.C. 1994), vacated in part, modified in

part, 899 F. Supp. 659 (D.D.C. 1995).

     In assessing these factors, courts have found fire safety conditions violated contemporary

standards of decency and required injunctive relief when inmates were exposed to serious fire

hazards without an established evacuation procedure. For instance, in Women Prisoners of the

District of Columbia Department of Corrections v. District of Columbia, the district court found

the prison's fire safety regime violated constitutional standards because (i) the dormitories were

overcrowded; (ii) the walls could not contain a fire within any room; (iii) only one fire exit

consistently remained unlocked; (iv) the building had no fire alarm system or sprinkler system;

and (v) fire drills had not been conducted within the past year. See 877 F. Supp. at 669. Another

court found a prison's regime violated constitutional standards because (i) its cells were replete

with fire hazards; (ii) the prison had no evacuation procedures or at least no tested procedures;

and (iii) multiple fire-related fatalities had occurred. See Toussaint v. McCarthy, 597 F. Supp. at

1410; see also Fischer v. Winter, 564 F. Supp. at 290 (finding overcrowding, lack of staff

training in emergency tools and evacuation, obstruction of exit ways and doors, and a

"particularly cumbersome" evacuation procedure required injunctive relief).

     Courts have also found that injunctive relief is appropriate when multiple fire safety

mechanisms such as alarms and sprinklers were inoperable. Carty v. Farrelly, 957 F. Supp. 727,

737 (D. Vt. 1997) (finding constitutional violation when the cell locking devices, manual alarm

systems, smoke dampers, and heat detectors were inoperable); see also Capps v. Atiyeh, 559 F. Supp. 894, 915 (D. Or. 1983) (finding constitutional violation when structure was old and susceptible to fire; smoke detectors and alarm system were inoperable; emergency exits ere inaccessible; and ladder did not reach the ground).

However, courts assessing prisons with fewer defects—even if those defects contravened private or state fire codes—have often found those conditions did not violate Eighth Amendment standards or require injunctive relief. Ruiz v. Estelle, 679 F.2d at 1152 (no constitutional violation despite "few available" emergency exits); Miles v. Bell, 621 F. Supp. 51, 65 (D. Conn. 1985) (no constitutional violation despite staff shortage and violation of non-fire-resistant laundry room). Indeed, violations of state or private codes on their own do not necessarily require injunctive relief. Patin v. LeBlanc, 2012 WL 3109402, at *17 (E.D. La. May 18, 2012), report and recommendation adopted, 2012 WL 3109398 (E.D. La. July 31, 2012).

B.      Analysis

State defendants are entitled to summary judgment as to the injunctive relief claim brought by plaintiff Norris, the only plaintiff who can still pursue this relief, because there is no genuine issue of material fact as to the adequacy of Sing Sing's fire safety procedures.

It is undisputed Sing Sing has a functioning fire alarm system, fire safety equipment located throughout the facility—including standpipes, fire extinguishers, flashlights, emergency lighting, and a fire truck—and multiple fire exits. The state defendants' records demonstrate officers regularly check this equipment. Signs in English and Spanish depict the primary and secondary emergency evacuation routes throughout Sing Sing and show the location of various fire safety equipment. Sing Sing also maintains a fire safety plan along with a three-page summary of that plan in the red book for reference in emergency situations.

Not only is every correction officer trained in fire safety at the academy and at their orientation to Sing Sing, but Sing Sing employs a full-time fire safety officer to oversee a dedicated fire response team of about sixty-two specially trained correction officers.  At least some members of the fire response team are on duty during all three tours at Sing Sing.  Sing Sing also maintains a relationship with the local Ossining Fire Department.  Officers conducted or simulated fire drills and evacuation of all housing block galleries 583 times between 2010 and 2016, roughly 83 times a year.  See Women Prisoners of D.C. Dep't of Corr. v. D.C., 877 F. Supp. at 653 (finding no fire drills for a calendar year violated Eighth Amendment standards). These and other fire safety procedures have been positively evaluated by DOCCS every year and by the American Correctional Association every three years since at least 2010.

Furthermore, since the fire occurred, Sing Sing has revised its evacuation plan and constructed a secure route between Housing Block A and the Housing Block B yard to evacuate inmates to an open-air area surrounded by guard towers for appropriate ventilation supervision. Other improvements to the windows, the lighting, the manual locks on the cells, and the back-up generator appear to resolve some of the problems alleged to have occurred in the April 18, 2011, emergency evacuation.

Plaintiff Norris argues Sing Sing's current fire safety regime still falls short of constitutional standards because Sing Sing (i) maintains an inadequate fire safety plan with not enough fire drills, (ii) lacks physical improvements including updated ventilation and fire suppression system, and (iii) in the event of power outage, lacks a block-wide automated cell release mechanism or a working public address system.  However, for the reasons discussed below, plaintiff Norris has not raised a genuine issue of material fact that inmates are currently being subjected to unreasonable safety risks that violate the Eighth Amendment.

First, for the reasons discussed above, plaintiff Norris has not raised a genuine issue of material fact as to the constitutionality of Sing Sing's fire safety plan and fire drills. Although DOCCS Directive 4060 requires that Sing Sing officials maintain the fire safety plan in the red book, which the state defendants admit is not done, this failure is not a constitutional violation. The Eighth Amendment does not mandate a specific location for a fire safety plan; it simply requires that officials have one.

Second, plaintiff Norris has not shown additional physical improvements like an updated ventilation and fire suppression system are required by the Constitution. It is undisputed that Sing Sing's system has other physical features to suppress a fire, including new windows, a suppression system in common areas, standpipes, fire extinguishers, and a fire truck. As another district court has recognized, an overall smoke management system is more constitutionally significant than a single suppression system. See Coniglio v. Thomas, 657 F. Supp. at 414 (finding constitutional violation because of lack of smoke barrier and system of effective smoke management but not because a sprinkler system was not available).

Third, plaintiff Norris fails to show a block-wide automated cell release and a working public address system in the event of a power outage is constitutionally mandated. In addition, the record shows Sing Sing has sought to buttress the back-up power system, the failure of which contributed to the problems in the emergency evacuation, by improving the connection between the main system and the back-up generator. Sing Sing has also improved its emergency lights, battery-powered radios, and upgraded manual cell release to ensure a timely evacuation in the event of another power outage.

Finally, plaintiff's fire safety expert Robert Rowe opines that Sing Sing's fire safety regime does not comply with the Fire Code of New York or Directive 4060. However, it is well

settled that the Eighth Amendment does not constitutionalize state codes or other policies.

French v. Owens, 777 F.2d 1250, 1257 (7th Cir. 1986) (noting that the Eighth Amendment "does not constitutionalize the Indiana Fire Code. Nor does it require complete compliance with the numerous OSHA regulations").

Thus, on the record in this case, the Court finds plaintiff Norris has not raised a genuine issue that Sing Sing's fire safety system is constitutionally inadequate. Accordingly, the state defendants are entitled to summary judgment on plaintiffs' claims for injunctive relief.

V.      C.O. Sumpter-Myers's Motion for Summary Judgment

C.O. Sumpter-Myers's motion for summary judgment is denied.

In her motion, C.O. Sumpter-Myers seeks summary judgment on the ground that plaintiffs fail "to allege plausible facts supporting any constitutional claim," while citing to the legal standards set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic v. Twombly, 550 U.S. 544 (2007). Those standards are not applicable to a motion for summary judgment and C.O. Sumpter-Myers otherwise fails to carry her burden to establish the absence of any dispute of material fact.

**CONCLUSION**

The state defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

C.O. Sumpter-Myers' motion for summary judgment is DENIED.

Claims brought by plaintiffs Garcia, Elufe, and Kazigo are DISMISSED WITH PREJUDICE.

Defendants Fischer, Capra, Keyser Jr., and Winship are entitled to summary judgment on plaintiffs' claims for injunctive relief concerning current fire safety and emergency evacuation protocol at Sing Sing.

Plaintiffs' only remaining claim is against defendants Heath, Morris, and Sumpter-Myers concerning plaintiffs' emergency evacuation from Housing Block A on April 18, 2011.

All counsel are directed to appear for an in-person conference in Courtroom 620 at the United States Courthouse in White Plains on October 11, 2019, at 11:30 a.m., at which time the Court will address all remaining case management and scheduling issues as well as the question of whether pro bono counsel will remain in the case for trial.

The Clerk is directed to (i) terminate plaintiffs Garcia, Elufe, and Kazigo, (ii) terminate defendants Fischer, Capra, Keyser Jr., and Winship, and (iii) terminate the motions (Docs. ##152, 165).

Dated: September 9, 2019
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge